# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: 24-cv-3274

DAVID LINDENBAUM, an individual; OATMEAL DRAGON LLC, a South Dakota limited liability company,

    Plaintiffs,

v.

ARIELE MYERS, an individual; KALE INOUE, an individual; KOTM, LLC, a Colorado limited liability company; and MOON MOTHER INVESTMENTS, LLC, a Colorado limited liability company,

    Defendants.

_____

## COMPLAINT AND JURY DEMAND
_____

Plaintiffs David Lindenbaum and Oatmeal Dragon LLC, through their counsel, Cambridge Law LLC, hereby submit the following Complaint and Jury Demand.

## PARTIES

1. Plaintiff David Lindenbaum ("**Mr. Lindenbaum**") has his residence in New York.

2. Plaintiff Oatmeal Dragon LLC ("**Oatmeal Dragon**") is a South Dakota limited liability company whose sole member is Mr. Lindenbaum.

3. Defendant Ariele Myers ("**Ms. Myers**") has her residence in Colorado.

4. Defendant Kale Inoue ("**Mr. Inoue**") has his residence in Colorado.

5. Defendant KOTM, LLC ("**KOTM**") is a Colorado limited liability company whose sole member is Mr. Inoue.

6. Defendant Moon Mother Investments, LLC ("**Moon Mother**") is a Colorado limited liability company whose sole member is Ms. Myers.

## JURISDICTION AND VENUE

7. Pursuant to 28 § U.S.C. § 1332, this Court has jurisdiction as there is diversity of citizenship and the amount in controversy exceeds $75,000.

8. Pursuant to 28 U.S.C. §1391, venue is proper in this Court because all Defendants reside in this judicial district.

## GENERAL ALLEGATIONS

**The parties come to own the Company together.**

9. Defendant TTH, LLC (the "**Company**") is in the business of selling online products.

10. The Company's business was originally owned and managed by Ms. Myers.

11. Mr. Lindenbaum was introduced to Ms. Myers by Mr. Inoue. Her business began using a warehouse owned by one of Mr. Lindenbaum and Mr. Inoue's companies. Eventually, the parties formed the Company to allow the parties to own together and grow the business.

12. MCS, LLC ("**MCS**") is a company owned 50/50 by Mr. Lindenbaum and Mr. Inoue.

13. Initially, MCS owned 66.66% of the Company and Ms. Myers owned 33.33% of the Company.

14. At all relevant times, Ms. Myers, Mr. Inoue, and Mr. Lindenbaum have served as the managers of the Company.

15. Although the roles of the managers and members of the Company are set forth in the Company operating agreements, in practice, the distinction between managers and members has not been recognized or respected by the managers and members. Consequently, a reference to a manager can be considered a reference to the member owned by that manager, and vice versa.

**Mr. Lindenbaum is appointed to lead the Company's online marketing efforts.**

16. The Company historically struggled to generate online sales. Because Mr. Lindenbaum had significant experience with online marketing, the Company eventually appointed Mr. Lindenbaum as the Marketing Lead.

17. After being appointed as Marketing Lead, Mr. Lindenbaum identified and recommended certain marketing professionals (for example, an individual to manage Facebook media and advertising) for the Company to hire, and the managers unanimously agreed to hire them.

18. At the time these marketing contractors were hired, Ms. Myers was in charge of company finances, and most of these contractors sent their invoices directly to Ms. Myers for payment.

19. For over two years, Ms. Myers, Mr. Inoue, or a third-party bookkeeper caused the Company to make payments to the marketing contractors.

20. Mr. Lindenbaum, on the other hand, oversaw the work of the marketing contractors hired by the Company.

21. During the three years in which Mr. Lindenbaum was the Marketing Lead, the revenues of the Company increased more than three-fold.

**Proposals from Mr. Lindenbaum are ignored or rejected.**

22. Mr. Inoue and Mr. Lindenbaum own a warehouse through another jointly owned company.

23. At all relevant times, the Company used the warehouse as its headquarters and for its manufacturing, procurement, storage, and fulfillment operations. At no time did the Company pay rent for the use of the warehouse.

24. MCS offers order-fulfillment (e.g., manufacturing, procurement, storage, packaging, shipping) services.

25. At all relevant times, the Company was using MCS's services and only paying cost for those services (i.e., MCS was deriving no profit from its work for the Company). Furthermore, MCS was financing these costs, and the Company would only reimburse MCS for the costs as late as six months after they were incurred.

26. Mr. Lindenbaum requested multiple times that the Company pay rent to Mr. Lindenbaum and Mr. Inoue's companies for the warehouse and pay an amount above cost for the fulfillment services.

27. Each time Mr. Lindenbaum raised this proposal, Ms. Myers and Mr. Inoue either ignored him or voted against the proposal.

28. In light of the significant work being performed by Mr. Lindenbaum, the significant revenues being earned by the Company, and the low overhead (given the non-payment of rent and below-market cost of fulfillment), Mr. Lindenbaum proposed that the managers each be paid a salary.

29. Mr. Lindenbaum raised this proposal several times, but each time Ms. Myers and Mr. Inoue either ignored him or voted against the proposal.

30. As a result, Mr. Lindenbaum was effectively forced to choose between continuing to have his companies provide services to the Company at below-market rates or to force the Company to look elsewhere for these services and pay market rates to other providers. Acting in the best interest of the Company, Mr. Lindenbaum continued to allow his own companies to provide their services, even though the benefits were realized by the entire company at the expense of costs born disproportionately by his companies.

31. All the while, Ms. Myers made numerous blunders that harmed the Company financially. For example, during the time she was in charge of paying invoices, she caused the double payment of a vendor, Sandeep, over an extended period of time, which resulted in losses to the Company totaling more than $20,000.

**Restructuring of the Company facilitates Ms. Myers and Mr. Inoue's oppression of Mr. Lindenbaum.**

32. In early 2024, Ms. Myers requested that the operating agreement of the Company be amended, in part and ostensibly to allow her ownership to be held by her newly created company—Moon Mother.

33. After discussion among the members, a new operating agreement was prepared and signed. Under this new agreement, the ownership structure of the Company was changed, so that instead of the company being owned 66.66% by MCS (which was owned 50% by Mr. Lindenbaum and 50% by Mr. Inoue) and 33.33% by Ms. Myers, each of Oatmeal Dragon (Mr. Lindenbaum's entity), KOTM (Mr. Inoue's entity), and Moon Mother (Ms. Myers's entity) became a 33.33% member of the Company.

34. As Mr. Lindenbaum soon discovered, however, there were ulterior motives for these changes.

**Ms. Myers and Mr. Inoue act oppressively regarding the Company and Mr. Lindenbaum.**

35. Shortly after the new operating agreement was signed, on May 23, 2024, Ms. Myers and Mr. Inoue called a meeting of the members/managers. In that meeting, they presented a proposal that Mr. Lindenbaum be removed as the Marketing Lead.

36. Both Ms. Myers and Mr. Inoue caused Moon Mother and KOTM (which, together, owned 66.66% of the Company) to vote in favor of the proposal, over Mr. Lindenbaum's objection (through Oatmeal Dragon, which was only a 33.33% member of the Company).

37. Such a vote would not have been possible prior to the changes to the operating agreement, under which Mr. Lindenbaum had a 50% vote/veto in MCS, which was the 66.66% member of the Company. Thus, the true motive for changing the operating agreement became clear: it was intended to erode Mr. Lindenbaum's rights and enable the other members to override and disregard Mr. Lindenbaum's wishes.

38. As justification for Mr. Lindenbaum's removal, Ms. Myers and Mr. Inoue argued that revenues had dropped significantly during the last months of his tenure as Marketing Lead. This justification was pretextual and disingenuous.

39. The following graph shows the Company revenues during Mr. Lindenbaum's tenure as Marketing Lead.



40. The small dip in revenues in early 2024 is insignificant when compared to the massive increase from 2021 resulting from Mr. Lindenbaum's marketing work and management.

41. During the meeting, Mr. Lindenbaum asked if the Company would be retaining the marketing contractors it had hired under Mr. Lindenbaum's tenure as Marketing Lead. When he

6

was informed it would not be retaining some of them, he asked if the Company would like him to communicate the termination to the marketing contractors or otherwise coordinate marketing transition efforts.

42. Ms. Myers explicitly said that she would communicate the termination to the contractors, that Mr. Lindenbaum was immediately relieved of any marketing-related responsibilities relative to the Company, and that Ms. Myers would be taking over all responsibilities for managing (and transitioning) the marketing for the Company.

43. Mr. Lindenbaum was essentially frozen out of any active role in the Company.

44. Two weeks later, Ms. Myers and Mr. Inoue called another meeting of the members/managers. In that meeting, they presented a proposal that each of them (but not Mr. Lindenbaum) receive a monthly salary going forward for their work relating to the Company.

45. Both Ms. Myers and Mr. Inoue caused Moon Mother and KOTM (which were each 33% members of the Company) to vote in favor of the proposal. Mr. Lindenbaum has regularly objected.

**Mr. Lindenbaum discovers mismanagement of the Company.**

46. Mr. Lindenbaum retained access to some of the accounts and books of the Company.

47. On review of these accounts and books, Mr. Lindenbaum discovered that Ms. Myers and Mr. Inoue had paid themselves salaries.

48. The salaries Ms. Myers and Mr. Inoue are paying themselves are vastly disproportionate to any benefit they are providing to the Company, such that they are effectively taking funds that would otherwise be distributed to *all* members (including Mr. Lindenbaum) and distributing those funds solely among themselves.

49. The savings to the Company from Mr. Lindenbaum's companies providing real property and services below market rates (or for free) were not being passed along to him but were instead being disproportionately, if not exclusively, enjoyed by Ms. Myers and Mr. Inoue.

50. Mr. Lindenbaum also noticed a precipitous decline in Company performance and profits as he reviewed the Company's records.

51. He inquired about this dip with Ms. Myers and Mr. Inoue and asked them to follow up with their new marketing team.

52. He learned that Ms. Myers had failed to secure the Company's marketing materials and failed to remove former marketing contractors' access to the Company accounts—including the Company Facebook account. As a result, certain materials and ads were lost or deleted, whether intentionally or inadvertently.

53. Consequently, the Company performance and profits are back at (or below) the levels they were prior to Mr. Lindenbaum becoming the Marketing Lead.

54. To add insult to injury, after firing Mr. Lindenbaum, awarding themselves a salary, and failing to secure the Company's marketing campaign, Ms. Myers and Mr. Inoue insisted that Oatmeal Dragon make a capital contribution to the Company, allegedly to pay a tax bill. They threatened to dilute Oatmeal Dragon if it failed to contribute.

55. Oatmeal Dragon was not willing to contribute additional capital, in part because after a previous capital call (where Oatmeal Dragon was asked to pay, and did pay, $32,000), Ms. Myers and Mr. Inoue "discovered" $122,000 in a Company PayPal account, which they immediately used for back-pay to themselves for their new monthly salaries.

56. Mr. Lindenbaum and Oatmeal Dragon had no reason to expect Defendants would engage in this course of conduct after changing the membership structure, which was contrary to

8

the way the Company's partners had acted before the change. Nor had Defendants communicated their intentions to Plaintiffs before implementing these changes—likely because they understood Plaintiffs would never have agreed to go along with them had they known Defendants' intentions.

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duty**
**(Against All Defendants)**

57. Plaintiffs re-allege and incorporate the allegations set forth in the preceding paragraphs.

58. The officers, managers, and controlling members of a limited liability company have a fiduciary duty to act in good faith and in a manner they reasonably believe to be in the best interests of the company and its members.

59. In a closely held company, the relationship between managers is akin to a relationship among partners.

60. Managers and controlling members owe the highest degree of loyalty and trust to the other members, are required to exercise good faith, and may not use their power to harm the other members.

61. As managers, controlling members, and officers of the Company, Ms. Myers, Mr. Inoue, Moon Mother, and KOTM owe fiduciary duties to Plaintiffs.

62. Ms. Myers, Mr. Inoue, Moon Mother, KOTM, or some combination of the four breached their fiduciary duties by engaging in the acts set forth above.

63. Under the circumstances, they have acted to their benefit to the detriment of Plaintiffs.

64. Mr. Inoue is liable for KOTM's unlawful conduct because he approved of, sanctioned, directed, actively participated in, and cooperated in this conduct.

65. Ms. Myers is liable for Moon Mother's unlawful conduct because she approved of, sanctioned, directed, actively participated in, and cooperated in this conduct.

66. Separately, Ms. Myers and Mr. Inoue are each individually liable because an individual is liable for his or her own tortious wrongdoing.

67. These breaches have caused Plaintiffs to incur damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### Oppression of a Minority Member/Manager
### (Against all Defendants)

68. Plaintiffs re-allege and incorporate the allegations set forth in the preceding paragraphs.

69. Oppression is deemed to arise when the majority conduct substantially defeats expectations that, objectively viewed, were both reasonable under the circumstances and were central to the minority's decision to join the venture.

70. The decision to pay Ms. Myers and Mr. Inoue a salary, while not compensating Mr. Lindenbaum; causing the Company to lose money; not paying to Mr. Lindenbaum's companies rent or market rate for services; and demanding that Mr. Lindenbaum make a capital contribution to the Company defeated Mr. Lindenbaum's reasonable expectations and show that Defendants acted in an oppressive manner.

71. Mr. Inoue and Ms. Myers (whether directly or through their entities) have refused to cause the Company to pay the managers a salary for years.

72. All the while, Mr. Lindenbaum was working (successfully) to increase three-fold the revenues of the Company.

73. After causing a change in the Company ownership and operating agreement, Ms. Myers and Mr. Inoue voted to pay themselves salary and to remove Mr. Lindenbaum from active participation in the Company, thereby justifying paying him no salary.

74. These actions by Ms. Myers and Mr. Inoue constitute oppression of a minority member/manager.

75. As a result, Plaintiffs have incurred damages in an amount to be proven at trial.

76. Mr. Inoue is liable for KOTM's unlawful conduct because he approved of, sanctioned, directed, actively participated in, and cooperated in this conduct.

77. Ms. Myers is liable for Moon Mother's unlawful conduct because he approved of, sanctioned, directed, actively participated in, and cooperated in this conduct.

78. Separately, Ms. Myers and Mr. Inoue are each individually liable because an individual is liable for his or her own tortious wrongdoing.

### THIRD CLAIM FOR RELIEF
### Fraudulent Concealment
### (Against All Defendants)

79. Plaintiffs re-allege and incorporate the allegations set forth in the preceding paragraphs.

80. Defendants concealed material existing facts that in equity and good conscience should have been disclosed, including among other things the reasons they wished to amend the ownership structure of the Company and their plans for actions they intended to take upon making those amendments.

81. Defendants knew these facts were being concealed, as they deliberately concealed them from Plaintiffs.

82. Plaintiffs were not aware and could not reasonably have been aware of the facts Defendants concealed.

83. Defendants deliberately concealed these facts with the intention that Plaintiffs act on that concealment and take actions (including participating in amendments to the Company's ownership structure) they would not have taken had the information been disclosed.

84. As a result, Plaintiffs have incurred damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF
### Civil Conspiracy
### (Against All Defendants)

85. Plaintiffs re-allege and incorporate the allegations set forth in the preceding paragraphs.

86. A combination of two or more Defendants—including at a minimum Ms. Myers and Mr. Inoue—reached a meeting of the minds on a course of action to prevent Mr. Lindenbaum and Oatmeal Dragon from realizing the benefits of their involvement in the Company.

87. There were one or more unlawful overt acts, which are set forth above, to accomplish this object.

88. Each Defendant either committed, or participated in the commission of, an unlawful overt act.

89. As a result of this civil conspiracy, Plaintiffs have suffered damages in an amount to be proven at trial.

90. Mr. Inoue is liable for KOTM's unlawful conduct because he approved of, sanctioned, directed, actively participated in, and cooperated in this conduct.

91. Ms. Myers is liable for Moon Mother's unlawful conduct because he approved of, sanctioned, directed, actively participated in, and cooperated in this conduct.

92. Separately, Ms. Myers and Mr. Inoue are each individually liable because an individual is liable for his or her own tortious wrongdoing.

## FIFTH CLAIM FOR RELIEF
### Negligence
### (Oatmeal Dragon Against Ms. Myers)

93. Plaintiffs re-allege and incorporate the allegations set forth in the preceding paragraphs.

94. Ms. Myers, as a manager of Company, owes an independent and non-delegable duty to the Company and to its owners to perform her obligations, including contractor oversight and payment.

95. Ms. Myers breached her duties to Oatmeal Dragon as set forth above.

96. Oatmeal Dragon was damaged as a direct and proximate result of the negligence of Ms. Myers.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, jointly and severally, as follows:

a. A preliminary and permanent injunction enjoining Defendants from paying themselves any further salary or backpay;

b. An award to Plaintiffs of damages incurred as a result of Defendants' wrongful actions described above, including but not limited to the recovery of actual and compensatory damages in an amount to be determined at trial;

c. An order directing Defendants to produce an accounting of all profits, benefits, and other monies obtained by them arising out of the wrongful actions described above;

d. An award to Plaintiffs of damages and all allowable costs, disbursements, and penalties in this action as the Court deems proper;

    e.   An award to Plaintiffs of all costs and reasonable attorney fees to the extent such may be allowable by law or contract; and

    f.   Such further relief in law or in equity to which Plaintiffs may show they are justly entitled.

Dated this 25th day of November, 2024.

                              Respectfully submitted,

                              CAMBRIDGE LAW LLC

                              s/ *Douglas N. Marsh*
                              Reid J. Allred, # 37934
                              Douglas N. Marsh, #45964
                              Cambridge Law LLC
                              4610 S. Ulster Street, Suite 150
                              Denver, CO 80237
                              Phone: 303.488.3338
                              Email: reid@cambridgelaw.com
                                             doug@cambridgelaw.com

                              *Attorneys for Plaintiffs*